Our next case on the call of the docket is case numbers 112-906 and 112-993 Rush University Medical Center v. Roger Sessions et al. I understand the attorneys for the appellants have agreed upon we just had a claim splitting case, time splitting in this case. So you're going to need to abide by the agreement and the clerk will let us know when your time's up. Your time's up. Your time's up. Counsel for the appellant. Good morning, Your Honors. John Brooks on behalf of Rush University Medical Center, if it pleases the Court. Your Honors, this case involves the appellate court's elimination of an important common law creditor's right in nearly 150 years of this court's precedent. The appellate court held that the Illinois Uniform Fraudulent Transfer Act, preempted by implication, what we've been referring to in our papers is the common law trust rule. The common law trust rule states the basic and we think self-evident principle that a person can't put their assets in trust beyond the reach of their creditors and retain for themselves the beneficial interest in those same assets. And if they attempt to do so, the creditors can reach the maximum amount of the assets that could be distributed to the debtor. Your Honors, we believe the appellate court's analysis in this case is flawed for at least three broad reasons. First, not only does it overturn all the precedent that I just mentioned, including, of course, 500 years of English common law and statute, but it suffers from serious statutory construction problems, both general and specific, including ignoring the Act's savings clause. Second, contrary to the substance of the opinion that the two can't exist in harmony, the common law trust rule serves a distinct and unique purpose in comparison to the Act and in no way interferes with the application of the Act. Third, the opinion establishes a basis for asset protection trusts in Illinois by judicial decision, a subject that we think has typically been reserved to the legislature. Let me just start with the statutory construction issues. Well, actually, let me just give a minute's worth of background. For context here, the case stems from Russia's efforts to collect on a judgment stemming from a charitable pledge. The maker of that pledge died in 2005, leaving an insolvent probate estate but a very large offshore trust, about $35 million, that purports to be governed by Cook Islands law. The trustee defendants refused to pay Rush, and Rush filed a four-count complaint. Count three of that complaint is what we're concerned with this morning, and that states the common law trust rule, which says that such trusts are void as to creditors. Rush moved for and was granted summary judgment in the circuit court, but the first district court treated that claim as alleging fraudulent transfers into the trust and reversed, holding that the common law trust rule was impliedly preempted by the passage of the Illinois Uniform Fraudulent Transfer Act in 1989. The appellate court did this, notwithstanding its own application of the common law trust rule in the Chapman case in 1998 and a series of federal cases applying Illinois law after the act and applying the common law trust rule. Let me just get to those statutory construction issues. First, we think the opinion is contrary to general principles of Illinois statutory construction, which caution a court to hesitate to find that a statute supplants the common law. Generally, we think that when the legislature intends to do that, that they're going to do it by plain and clear language and that repeal by implication is not favored. But moreover, the opinion is directly contrary to two sections of the act, the Fraudulent Transfer Act. It's contrary to the savings clause in Section 11. First of all, the prefatory actually the opinion doesn't even mention the savings clause. The prefatory note of the drafters of the UFTA states that the act does not purport to cover the whole law, avoidable transfers and obligations. And the Illinois Act Savings Clause reflects an intent to preserve the common law as much as possible. Yet the appellate court's opinion gives us the result as if the act had ordered the displacement of the common law, something that our legislatures clearly know how to do in other statutes. Secondly, the opinion conflicts with the mandate of the act in Section 12, that Illinois law be in harmony with other states. Section 12 expressly provides that the act should be construed to make Illinois law uniform with other states' interpretation of their UFTA provisions. We give abundant examples in our papers of other state courts who found that their legislatures did not intend to curtail any creditor's rights, but rather to expand on them and to give supplementary remedies. No court in any other jurisdiction has read its savings clause so narrowly as to eliminate or displace any common law action against self-settled trust. So in this case, the appellate court opinion does exactly the opposite of what Section 12 mandates, unnecessarily eliminating valuable creditor's rights and making Illinois an outlier in this area of the law. I also want to emphasize the common law trust's unique purpose. Beyond the statutory construction problems, even though the common law trust rule has existed comfortably and compatibly with fraudulent transfer statutes in Illinois for over 100 years, the appellate court now asserts that the common law trust rule and the act can't exist in harmony. And I want to address that point, because we think both the act and the common law occupy different spheres, different spaces in the law of creditor's rights. The main difference between the two is that the act is concerned with specific transfers, while the common law trust rule focuses on the interest retained, an interest that under trust law was never transferred in the first place. The legal effect is the same as if the settlor still owned the assets that could be distributed to him. It merely reflects the public policy that all of a debtor's property, both legal and equitable, be available to satisfy his debts. I want to get to one point. I see my light coming on here. Most importantly, I think, to understanding this case, defendants repeatedly mischaracterized the common law trust rule to say that it treats the debtor's transfers to a self-settled trust as per se fraudulent. And it casts it this way in order to create a false conflict with the act and its tests under that act for fraudulent transfers. And I suspect you'll hear counsel bring up that argument again this morning. But as the restatement and the cases all tell us, whether the transfer of legal title to the trust is fraudulent or not is immaterial. Again, it's the interest retained that creditors are able to get at. Creditors may still reach their debtor's retained interest whether the transfer was fraudulent or not. So the common law trust rule doesn't really even implicate the act or the tests for fraudulent transfers under that act. We think, again, that both the act and the common law occupy very different spheres in the law. And I see I'm about to run out of time, so I'm going to yield to the Illinois Attorney General. Thank you so much. Thank you. May it please the Court, I'm Assistant Attorney General Richard Huzik, counsel for the people of the State of Illinois on the relation of Attorney General Lisa Madigan in her capacity as the legal representative of the beneficiaries of all Illinois charities. And in this case, the plaintiff is a charity. And so we were involved in the circuit court, formally intervened in the appellate court, and have taken essentially the same position they have, which is that we urge this court to reverse the appellate court's ruling that the Illinois Uniform Fraudulent Transfer Act impliedly abrogated the common law rule relating to self-settled trusts. And that rule, as Rush's counsel I think correctly described it, is that you can put assets into a trust for other beneficiaries. And if it's not a fraudulent conveyance, then the rights of those beneficiaries take free from the rights of creditors. But you can't put assets into a trust for your own benefit and have those assets remain useful to you and beneficial to you but out of the reach of your creditors. Mr. Huzzick, the trustees make the argument that Sessions was not actually a debtor of Rush because the promise he made to them was not operative until his death, and Rush was never a judgment creditor during his lifetime. They argue that by the time of Robert's death, the trustees contend that the trust was in other hands and was never part of the estate and could not be reached by a creditor such as Rush who had no cause of action during the decedent's lifetime. How do you address that argument? Okay. It appears that they are trying to define a debt as something that's immediately enforceable and collectible at the time of the debtor's life. And that's never been the proper definition of a debt. A debt includes promises that are made payable only upon the death of the debtor. And it's as if these assets were put into a safe deposit box. If the debtor died and the assets were in a safe deposit box, a promise that the payments would be made upon your death doesn't cease to be a debt of the debtor or a debt of the estate. Otherwise, probate would be a pretty simple and straightforward matter. You'd say that the decedent died and, therefore, all of the debts of the decedent disappeared. They're not debts at all. It's a novelty to argue such a thing. And none of the cases have ever recognized any limitation on the common law rule regarding self-settled trusts that they advocate here. In fact, the universal jurisprudence from other state supreme courts, there are three from Mississippi, Oregon, and Pennsylvania, which we have cited, I believe it's page six of our reply brief, all hold that the common law rule survives with respect to assets that could have been distributed to the settlor during the settlor's life. The rule does not somehow evaporate in its application by the fact of the settlor's death. And it goes back to the underlying principle and policy of the rule, which is based upon the nature of a trust in the first place, which is a separation of the legal and equitable interest in property so that the legal interest is held by the trustee and the equitable interests are held by the beneficiaries. But when the beneficiary happens to be the settlor, he retains that equitable interest in the property. The law of trust deems that interest as never having left the settlor in the first place. It's still the settlor's property, which is why they say the trust is void as to creditors. If there are no creditors that are unpaid at the end of the day, the trust terms can be implemented according to their terms. But the whole notion that you can't have your cake and eat it too, you can't put assets into some vehicle like a trust so that you get to retain the beneficial use of them, but your creditors can't reach them is anathema to the longstanding public policy. It's been part of English statutes dating back to the 15th century and was made a part of Illinois common law by the Common Law Act in the 19th century. And the suggestion that somehow Illinois should adopt a variation on that rule that no other state has adopted and make this state essentially a haven for, if you'll pardon the expression, deadbeat millionaires, somebody who dies with a $35 million estate but arranges so that all of that goes to his friends and heirs and relatives and none goes to pay his just debts is simply, I think, a step that is not justified based upon the purpose of the Fraudulent Transfer Act. And it's not good policy for this state to become such an outlier and adopt such a rule, even with respect to assets that have not been distributed to the settlor during the settlor's life. Under the Law of Trusts, all those assets, to the extent they could have been distributed to the settlor, are deemed as the settlor's property. And so regardless whether the debt accrued or matured or became enforceable either before the settlor died or at the moment of the settlor's death in this case, then they are still within the purview of the common law rule. I think that the Court has been in the past very careful not to imply an abrogation of common law principles based upon slender language that's at best ambiguous. It has said that the test is that there has to be a necessary implication based upon the notion that the two rules, the statute and the common law rule, cannot both be given effect and that preserving the common law rule would deprive the statute of any effect and render its provisions nugatory. That's not the case here because each of the two rules, the statute and the common law rule, are motivated by a distinct policy purpose and each has a different sphere of application. The Act focuses upon fraudulent transfers, whether they be into a trust or to a relative or to a spouse or anybody else. The common law rule is separately motivated by the principle that it's unfair and against public policy to tie your assets up in a trust so that you get the beneficial use of them but your creditors can't reach them. And that policy has gone back for hundreds of years. It's been the policy of Illinois recognized in numerous cases. And it's also been reflected in the continued codification of what is now Section 2-1403 of the Code of Civil Procedure, which says in essence that although creditors normally cannot reach assets held in trust for a beneficiary, that exemption from execution doesn't apply when the beneficiary is the person who created and funded the trust in the first place. That's the self-settled trust rule of common law. And it implements this common law. And it would be strange indeed to assume that at the same time that the legislature has preserved that rule in the Code of Civil Procedure and it's made exemptions to the general rule for regular beneficiaries when you're dealing with child support and the like, but it keeps on reenacting the same qualification relating to self-settled trust. It would be unusual to assume that the legislature preserved that reflection of the common law rule and at the same time intended to abrogate it by passing the Fraudulent Transfer Act, which again focuses on a different policy and a different scope of application because it's directed at transfers that are fraudulent at the time they're made, whereas the common law rule says it doesn't matter whether you had any fraudulent intent or whether the transfers are fraudulent at all. It's based upon a separate policy that the law, that creditors can reach. Anything that could have been distributed to the settlor, whether it's interest or principal or income, all of them as to them the trust is treated as void. I'm going to relinquish the rest of my time unless the Court has any questions and then continue back on rebuttal. Thank you, Your Honors. Thank you. Counsel for the appellee. Good morning. My name is Ed Joyce, and I represent Jim Arnold and Robert Sessions, who are the trustees of the Sessions Family Trust. I'm going to start at the end. It's sort of amazing to me the way Rush and the Attorney General torture a decision that very clearly and simply deals with one narrow issue. The only appellate court simply said that after the Fraudulent Transfer Act was amended, a transfer into a self-settled trust would no longer be per se void or fraudulent. That's all the court did. There's nothing the court did that in any way prevented a creditor from obtaining an asset owned by a settlor at any point in time. From the minute the settlor funded the trust that wasn't fraudulent because he kept back money to pay his bills or there was no intent to defraud, the minute that trust is funded, if a debtor has a right to be paid, he can demand payment, and he can then seek to collect from any asset of the settlor. Now, in this case, had Rush been a creditor, which it wasn't, he could have asked Mr. Sessions to pay me from your assets outside the trust or pay me from your interest in the trust, but pay me. And if he had that ability to ask for payment, Mr. Sessions certainly would have paid him. Now, the Illinois appellate court said that Rush Let me understand your argument, Mr. Joyce. And that is all obviously prior to his death. Is that what you're talking about? Of course. Right? Of course. Because after his death, as I understand the facts, their position was there was a $1.5 million pledge for this home, and the estate had $100,000 in it after his death, right? Well, the estate had $500,000. But there's no question the estate had insufficient funds to fund a $1.5 million gift. Okay. So, in any event, they make all these arguments that are not supported by the facts, that are not supported by the appellate court decision, that we don't even disagree with. As far as we're concerned, if Rush was a creditor, they could have collected in 1996 from Sessions personal assets, which, by the way, is undisputed. Sessions retained personal assets sufficient to pay all of his creditors. And, in fact, he made $28 million of taxable income between the date of his promised gift and his death. Now, this case was resolved by the trial court before there was almost any discovery conducted. No one knows where that money went, what he did with it. Was he a bad gambler? Did he bet on the wrong horse? Did he bet on the wrong stock? Did he have an expensive girlfriend? Did he give it away? No one knows. Okay. But what's pretty clear here is Rush and the AG are too smart to make the arguments they're making. They're making the arguments they're making because they want this court to reinstate the old common law rule that every self-settled trust is void. There's no reason to do that. The Corrosion Transfer Act protects all creditors. It also protects settlors who desire to set up a trust that at least in part is for their benefit as long as they retain sufficient assets to pay their creditors. So they've added one right to a settlor and taken away nothing of consequence from a creditor. And Rush talks about, my God, it's going to be so time-consuming and expensive to get this money. If you're a debtor, a creditor, you serve a citation to discover assets. You're going to get a list of where the assets are and what they are. You can go get them. Wasn't there even some period of time, Mr. Joyce, that Mr. Sessions was living where the money was not there, the money was all transferred to the trust? Absolutely not. That's absolutely a statement they make that is totally false. It is contradicted by the facts. In fact, in one of their own pleadings, I can't tell you the exact. So let me, I want you to address this. So it isn't true that the money went into trust to try to, Isn't there some allegation here that Mr. Sessions at one point was mad at Rush because he thought they Killed him? He was mad as the devil at Rush. I was exactly going to put it that way. Right. He was very angry because he thought they killed him. As a matter of fact, we sued him for malpractice. But that aside, Mr. Sessions So there wasn't a period of time in which the monies went into the trust and the estate could not have provided the $1.5 million? No. Here's what happened, Your Honor. In 1994, Sessions transferred certain assets into trust. It's a Cook Island trust. Rush takes great joy in saying it's an offshore trust. What they don't tell you and what they know is those assets were essentially real estate in Illinois, Texas, and New York. They're not sitting in some bank in some distant island. They're here. Now, two years later, he made a promise to make a gift to Rush at some point in the future. In fact, the letters indicate after he died. After he died. So Rush took no steps whatsoever to secure a fund of assets during his lifetime to pay for the cost of this building. Now, let me go to your question. After Mr. Sessions made his gift to Rush, he made $28 million of taxable income. And he transferred one asset into a revocable trust, which the executors considered an asset of the estate. It was there to pay bills. It never was an attempt to get it away from Rush. Rush takes the position that certain real estate that was owned in his name was transferred to an asset of the trust to avoid their ability to collect. In one of their pleadings, they correctly point out that the real estate was held in the name of Robert Sessions as trustee. And in both Illinois and Colorado, where these partnerships are located, it is perfectly appropriate for the general partner to hold an asset in his name. What effect does this rule in this case have on all of the many charitable institutional programs where they encourage people to make provisions for charities in their will? It has no effect whatsoever. If I made a promise to give a gift to a charity, at the time I made the promise, I thought I could afford to make the payment. But for some reason, when I died, my estate was inadequate. The charity is not going to get paid. Now, if the charity wants to protect itself, is it going to build a building? They asked the donor, would you fund that cost now? Would you set aside an asset now? Rush didn't do that. So that's how Rush could or should have protected itself, was saying, we don't want the promise in the future. We want the money now. Yes, they could have done that. They could have done that. There's no evidence that Rush ever asked Mr. Sessions, what do you own and where is it located and how do I get it? Okay? Well, most of them wouldn't be able to get that kind of information unless the donor wants to make some kind of disclosure. In this case, based on the exhibits to the verified complaint, it is obvious that Mr. Sessions and Rush liked each other. They were friends. He made a gift to Rush because he liked Rush at that time. There's no evidence that if Rush had asked the question, he wouldn't have answered it. It's speculative to suggest he would have funded it because he wasn't asked to do so. But they raised the issue of 214.03. Okay? that wasn't set up by the debtor, you can't collect your judgment. Not very startling. It's been the law for I don't know how many years. The converse under Rule 156 is true. If in the situation of Mr. Sessions, had he set up his trust, retained a life interest, and was then a debtor to Rush, Rush could have collected. They could have collected from any asset he owned. They didn't try to collect because they weren't a debtor. Now, this decision changed none of that. It didn't change 1403. It didn't change Rule 156. It does nothing at all to prevent any creditor from collecting from any debtor. It just says the mere fact that a settlor transfers assets into a self-settled trust will not in and of itself make that void. Not very startling. That's all it says. I've got more I could say, but I think that's all I want to say. I think you argued that Rush forfeited certain arguments. What arguments were those? I understand I'm wrong. I was told after the fact, when I read some of the cases they cited, that I'm wrong. They were the affiliate. They were the affiliate. I learned a lot during this case. Any other questions I could answer? Yes, sir. It seemed the ‑‑ I thought the case was pretty simple coming in. Does the Fraudulent Transfer Act apply or does the common law apply as far as the allegations? But you seemed to introduce an element or maybe a couple of elements. One, that this was not even a debt or an enforceable claim. Is that really the issue? No, it isn't because let's assume it was a debt. If Mr. Sessions owed money to Rush in 1994 when he established this trust and he did not set aside sufficient funds to pay his creditors, then the creditor could establish that the transfer into trust was fraudulent under the act and get the money. There'd be no protection because it was in the trust. Now, if you're not a debtor, then you have no standing to complain about a non‑fraudulent transfer into trust. And why should you? You're not a debtor, you weren't hurt, and no other creditor was hurt. I guess I understood the Rush's argument to be that if the common law applies, you're not concerned about a fraudulent transfer. It's just that public policy would require that a settler not set up a trust for his own benefit to avoid obligations of their creditor. So, again, that comes back to whether they're a creditor. But if, in fact, they are a creditor, and if we say the common law applies, where do you go then? Well, if you say the common law applies, then I think you have to be saying the legislature didn't have the power to amend the Fraudulent Conveyance Act and that the language it used was sufficiently vague enough to permit the common law rule to stand alongside of the amended Fraudulent Conveyance Act. Now, the problem with Rush's position is it mixes everything up. Rush definitely is arguing that you should conclude that the common law rule, that all self-settled trusts are void and implicitly fraudulent. You should keep that as the law. You should ignore the fact that the Fraudulent Conveyance Act says to prove that a transfer is fraudulent, you must do either 5A1 or 5A2. They didn't do either. They admit they didn't do either. Now, they're trying to do both in different counts in the same complaint. So they might succeed, they might not. We don't know. But they've taken a route that clearly was taken away from them by the legislature, and it did not put them in any prejudicial position. Because had they been a debtor, a creditor rather, they could collect. Any other questions? Thank you. Thank you, Counsel. Rebuttal? Thank you, Your Honor. Just a few comments on Mr. Joyce's arguments here. He takes Rush to task, it seems to, for not pursuing a collection during Mr. Sessions' lifetime. This, as we sort of point out, is the heads, they win, tails, we lose idea. They point out in their briefs that we didn't have the ability to collect during his lifetime. The pledge could be paid during his life or at death. The man had all the indicia of a very wealthy gentleman. He showed Rush estate planning documents that gave them the gift that they were supposed to get. I don't quite understand this allegation that we have to protect ourselves against this fraud. Are we supposed to check with our creditors and make sure that they haven't established any trust that we need to know about? The public policy, I think, here is pretty clear that we're all supposed to be just before we're generous. And in this case, the argument is, well, assuming he's indicating that the common law trust rule has applied, apparently he says it doesn't apply in this case because there's no more interest to reach. As the Attorney General pointed out in his comments, that argument has been raised by creative counsel a number of times and rejected by state supreme courts around the country. Here we have an Illinois resident, and as they like to point out, these assets are located in Illinois. They're just conveniently retitled in the name of the trust that says the Cook Islands law applies. But we have Illinois assets in real estate and bank accounts and so forth. We have an Illinois resident. And we think Illinois law is fairly clear that you can't establish a trust for your own benefit to the exclusion of your creditors. This, as I mentioned in my opening remarks, creates a great opportunity for Illinois asset protection trusts that generally are thought to require some action by the legislature. We can all put our assets in trust and feel good that as long as they pass the transfer test under the act at the time, that some day should we spend down our non-trust assets and need to live off the trust, as Mr. Sessions was apparently doing, then that's okay. Our nest egg is intact. And we can even leave it to our creditor, I mean to our relatives and others, free of the claims of creditors. I don't think we've evinced any intention to repeal the common law, certainly not by any clear standard. There's a savings clause in the act. And as I pointed out, the two things don't apply to the same area. We're interested in what this gentleman retained. And I don't think there's any more compelling public policy to say that he can put his assets beyond the reach of his creditors, but is it more compelling that he can leave them to his relatives and others free of the claims of creditors in this kind of a trust? I just don't think so. Do your honors have any questions for Rush's position in this case? Thank you. May it please the Court, the Appellees, the Sessions, and the Trustees have advanced two arguments in front of this Court to try and sustain the judgment of the appellate court that Rush gets nothing and that their heirs and relatives get everything out of all of his substantial assets. The first was the one adopted by the appellate court, the implied abrogation of the common law. We've said enough here and in our briefs on that issue. I'd like to focus on the second one here, which has elicited some of the questions by the Court, and I'd like to make sure that there's not a misunderstanding about that. But if I can, I just want to clarify factually, too, there is no question that Mr. Sessions' estate when he died did not have enough assets to pay the $1.5 million pledge to Rush that said it was payable when he died if he didn't previously pay it. It's also without question that he was borrowing money in the last months of his life from some of the companies he founded. So I think that illustrates the whole principle that we're referring to, which is if you accept their cramped reading of the common law rule, it would be only too easy for somebody to set up these trusts at a time when they don't have any fraudulent conveyance concerns and then slowly use up their non-trust assets, burn those down, so that at the end of the day if they can keep their creditors at bay long enough, they will be able to give all of their money to their heirs and relatives and none to their creditors in violation of the principle that goes back to Blackstone and beyond, which is you have to be just before you're generous. There is nothing in the Appellate Court's decision that supports this cramped reading of the common law rule that they're advocating here. It is contrary to all relevant precedent in all other states. This Court, I urge not to adopt a contrary position, which would be fundamentally against the public policy that underlies that common law rule. And they urge this illusory distinction between debts of the decedent and debts of the estate. They are for all purposes in a probate context the same. The estate succeeds to the position of the decedent with respect to the decedent states, but except for new debts incurred by the administrator or executor, administrative expenses, there is no difference. The estate succeeds to the debts of the decedent, and in this case, this was a debt of the decedent. And it doesn't simply evaporate and become a non-liability with respect to assets that could have been distributed to Mr. Sessions during his life. It would wreak havoc with the commonplace structuring of estate planning and charitable giving, as Justice Garmon indicated. If many people are urged to make sure that their assets are enough to provide for their needs when they're alive, but they leave enough for a charity, their favorite charity at the end of the day, it would be a bizarre proposition to say that all of those get undone if, at the end of the day, those gifts are treated, especially if there's reliance upon them, as there was in this case. A building was built with Mr. Sessions' name on it. If those debts became essentially invalid and preference was given to the heirs as opposed to the typical situation the other way, which is the creditors get paid first and then the heirs only thereafter. You can structure these charitable gifts however you want, but you don't want to throw a monkey wrench into the way that they normally operate and are understood to operate now. And I would urge the Court, lastly, to look at the Deposit Guarantee National Bank v. Heller case. It's a recent Mississippi Supreme Court case. It addresses the very proposition that's advocated by the Sessions in this case, which is pay no attention to the distributions made to Sessions during his lifetime, but if they were distributable to him but not distributed, then creditors are out of luck. What's ever left in the trust at that point goes only to my relatives and heirs, and my creditors get nothing. The Court rejected that. Their reasoning is sound, and I urge this Court to adopt it. I'm not sure. Is that my red light? Okay. Unless the Court has additional questions, I've covered the points both in my brief and my oral argument that we'd like to make,  and to affirm the circuit court's judgment. Thank you so much. Thank you. Case numbers 112906 and 112993, Rush University v. Sessions, is taken under advisement as agenda number 10.